# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

LARRY LAWSON, JR.,

    Plaintiff,

v.

KATHLEEN GREEN,
LT. W. JOSEPH and
DIVISION OF CORRECTION,

    Defendants.

Civil Action No. TDC-16-2946

## MEMORANDUM OPINION

On December 24, 2015, self-represented Plaintiff Larry Lawson, Jr., an inmate at Eastern Correctional Institution ("ECI") in Westover, Maryland, was stabbed by another inmate. He now brings this civil action against Defendants Kathleen Green, the Warden of ECI at that time; Lieutenant Wendy Joseph, a correctional officer at ECI; and the Division of Correction (the "DOC") pursuant to 42 U.S.C. § 1983, alleging that Defendants failed adequately to protect him from a known threat to his health and safety, in violation of the Eighth Amendment to the United States Constitution. Pending before the Court is Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment. For the reasons set forth below, the Motion is GRANTED.

## BACKGROUND

On May 29, 2015, Lawson was transferred from a housing unit on the east side of ECI to Housing Unit 2, on the west side of ECI. Lawson was transferred due to a dispute with Larry Pollin, a member of the Crips gang who was known to ECI officials to be an "enemy" of Lawson and was listed as such in Department of Public Safety and Correctional Services ("DPSCS")

records. Pollin was flagged as Lawson's enemy when Lawson reported that Pollin had threatened to stab him or have other Crips members assault him. Pollin was served with an infraction as a result.

On July 18, 2015, while in Housing Unit 2, Lawson provided information to ECI officials regarding contraband possessed by his cellmate. After providing the information, Lawson was placed in segregation in Housing Unit 4 as a preventative measure. While there, Lawson learned that other inmates had told his former cellmate that they had seen Lawson give a correctional officer a note about the contraband located in their cell, and the former cellmate had then told other inmates that Lawson was a snitch.

Lawson was due to be released from segregation on July 27, 2015. That day, he participated in an interview with Lt. Joseph, then the manager of Housing Unit 2, regarding re-housing. Lawson told Lt. Joseph that he did not feel safe in Housing Unit 2, because "everybody knows about the information I gave officers in her building," and because members of the Crips were housed there. Compl. at 5-6, ECF No. 1. According to Lawson, all of the Crips at ECI were housed together on the D Tier of Housing Unit 2, and he had explained to Lt. Joseph months before "the danger of my safety being placed around known Crips." *Id.* at 6. Lt. Joseph did not offer Lawson the opportunity to make a written statement regarding his safety concerns.

Instead of investigating Lawson's safety concerns, Lt. Joseph issued him infractions for refusing housing and disobeying an order. As a result, Lawson was returned to segregation. On July 28, 2015, Lawson completed an Administrative Remedy Procedure request ("ARP") challenging his return to segregation. In the ARP, Lawson stated that he had told Lt. Joseph that he could not be placed on the D Tier in Housing Unit 2 because he has a known enemy who is a member of the Crips gang, Crips are housed on the D Tier, and Lawson had previously been

approached by a Crips member about "the reason I have [an] enemy as a Crip from [the] start." Lawson ARP at 1, Resp. Mot. Dismiss Ex. A, ECF No. 17-3. According to Lawson, the "only thing that was saving me" from the Crips members was the fact that he was previously assigned to C Tier, rather than D Tier. *Id.* In addition, Lawson stated that he had advised Lt. Joseph that "word got out about" the "info I gave on 7-18-15 about my cell buddy." *Id.* Lawson claimed that he had "told Lt. W. Joseph, I just want to be safe and it would be good for me to be placed in another building," but that instead she had punished him by returning him to segregation. *Id.* On August 25, 2015, the complaint was dismissed by the Warden's office without a direct response from Warden Green. The ARP was stamped with the message that it was dismissed "for procedural reasons" because "[i]nmates may not seek to resolve a complaint through the ARP for Inmate disciplinary proceeding procedures and decisions." *Id.*

After his release from segregation on November 9, 2015, Lawson was directed to return to Housing Unit 2. Lawson went to his cell as directed to avoid remaining in segregation. While assigned to Housing Unit 2, Lawson was extorted by other inmates and denied access to the public phones. On November 19, 2015, his television was stolen out of his cell. The television was recovered that same day. Lawson was then reassigned to Housing Unit 3. Lawson asserts that the transfer to Housing Unit 3 did not present less of a threat than his assignment to Housing Unit 2 because Housing Unit 3 is next door to Housing Unit 2, Lawson had been "labeled a snitch," and other inmates were blaming him for the loss of contraband that was discovered and destroyed during the search for the television. Compl. at 7. Lawson was approached by Crips members, who extorted him to pay for the lost contraband. Lawson asserts that instead of transferring him to Housing Unit 3, Lt. Joseph should have placed him on "pending 120" status, which refers to having a pending investigation of safety concerns. *Id.*

On December 24, 2015, while assigned to Housing Unit 3, Lawson was attacked by another inmate. At approximately 8:15 p.m., while Lawson was making a telephone call, he was approached by another Housing Unit 3 inmate who told Lawson that he could not use the telephone. Lawson ignored him and continued with the call. Shortly afterwards, as Lawson was leaving the recreation room, the other inmate stabbed Lawson several times in the head and upper body with a homemade metal weapon. During security rounds, Correctional Officer Brian Tawney became aware of the attack when he saw that Lawson was bleeding profusely from his head. Lawson's injuries, which included a punctured lung, were severe enough to require his transport to the emergency room at Peninsula Regional Medical Center. Lawson remained hospitalized until January 1, 2016, when he was returned to ECI for further medical treatment. Lawson states that since the stabbing he has been dealing with mental and physical issues on a daily basis.

Based on a description by Lawson, the assailant was identified as Oba Mitchiner. It is unknown whether Mitchiner is affiliated with any criminal gang. Mitchiner had not previously been identified by DPSCS as an enemy of Lawson.

On January 11, 2016, Warden Green wrote to Lawson in response to correspondence Lawson sent to Maryland Governor Larry Hogan regarding the December assault.[1] In the letter, Warden Green acknowledged that after the theft of his television, Lawson was "moved to housing unit 3 from housing unit 2 as a preventative measure," but stated that there was "no documentation on file that substantiates your claim that the institution had prior knowledge that you were in fear of your life or that you believed you would be harmed, while housing in unit 3." Resp. Mot. Dismiss Ex. D, ECF No. 17-6. In the letter, Warden Green also advised Lawson that

---

[1] The correspondence sent to Governor Hogan is not in the record.

because he had informed the investigating officer that he no longer felt safe in general population at ECI, Lawson had been placed on "the transfer list" and would be transferred to another institution when "safe, suitable housing" could be found. *Id.*

## DISCUSSION

### I. Motion to Appoint Counsel

Pending before the Court is Lawson's Motion to Appoint Counsel. A federal district court may appoint counsel when an indigent claimant presents exceptional circumstances. 28 U.S.C. § 1915(e)(1) (2012); *see Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975); *see also Branch v. Cole*, 686 F.2d 264, 266 (5th Cir. 1982). Upon careful consideration of Lawson's filings, the Court finds that he has demonstrated the ability either to articulate the legal and factual basis of his claims himself or to secure meaningful assistance in doing so. Because no hearing is necessary to the disposition of this case and there are no other exceptional circumstances that would warrant the appointment of an attorney, the Motion to Appoint Counsel, ECF No. 52, will be denied.

### II. Motion to Dismiss, or in the Alternative, for Summary Judgment

In their Motion, Defendants seek dismissal under Federal Rule of Civil Procedure 12(b)(6) or summary judgment under Rule 56. In support of the Motion, Defendants argue that (1) the DOC is not a proper defendant in a § 1983 case; (2) the Eleventh Amendment bars the claims against the DOC and against Lt. Joseph and Warden Green in their official capacities; (3) Lawson cannot demonstrate that Warden Green is liable under a theory of supervisory liability under § 1983; (4) Lawson has not alleged sufficient facts to state a plausible claim for relief; (5) there is no genuine issue of material fact; and (6) Defendants are entitled to qualified immunity.

## A. Legal Standards

### 1. Motion to Dismiss

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678. The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

### 2. Motion for Summary Judgment

Defendants have submitted evidence for the Court's review. Although a party may move for summary judgment before the commencement of discovery, *see* Fed R. Civ. P. 56(b), "summary judgment [must] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986)). The proper procedure for seeking additional time for discovery is to file an affidavit pursuant to Federal Rule of Civil Procedure 56(d) explaining why the party needs discovery to establish the existence of a genuine issue of material fact. *Id.* If a party does not submit a Rule 56(d) affidavit, the Court may, but need not, still consider a request for discovery presented in the non-movant's memorandum of law opposing summary judgment. *Id.* at 244-45.

Because Lawson has not submitted a Rule 56(d) affidavit or otherwise persuasively argued that discovery is necessary in order to establish the existence of a genuine issue of material fact, the Court construes both Motions as motions for summary judgment.

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

### B. Division of Correction

Defendants seek dismissal of the claims against the DOC because it is entitled to Eleventh Amendment immunity and it is not a proper party to a suit under 42 U.S.C. § 1983. Although the DOC's Eleventh Amendment argument would appear to implicate this Court's jurisdiction, *see Calderon v. Ashmus*, 523 U.S. 740, 745 n.2 (1998) (noting that "the Eleventh Amendment is jurisdictional in the sense that it is a limitation on the federal court's judicial power"), the Court must turn first to the statutory argument that the DOC is not a "person" within the meaning of § 1983. *Vt. Agency of Nat. Res. v. U.S. ex. rel. Stevens*, 529 U.S. 765, 779

(2000) (finding that the question of whether a statute permits a cause of action against states should be addressed before the question of whether the Eleventh Amendment bars the cause of action); *Power v. Summers*, 226 F.3d 815, 818 (7th Cir. 2000) (noting that pursuant to *Vermont Agency of Natural Resources*, the district court should have dismissed claims against state officials in their official capacities on the grounds that they were not persons within the meaning of § 1983 rather than on Eleventh Amendment grounds).

Section 1983 makes liable "[e]very person" who, under color of state law, deprives an individual of constitutional rights. 42 U.S.C. § 1983. State agencies are not persons within the meaning of the statute. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70 (1989) (holding that "States or governmental entities that are considered arms of the state" are not subject to suit under § 1983). Because the DOC is a unit of the State of Maryland operated by DPSCS, it is not a person amenable to suit under § 1983. *See Clark v. Md. Dep't of Pub. Safety & Corr. Servs.*, 316 F. App'x 279, 282 (4th Cir. 2009) (holding that DPSCS is not amenable to suit under § 1983); *Livingston v. Md. Div. of Corr.*, No. WDQ-09-682, 2009 WL 3074608, at *1 n.1 (D. Md. Sept. 18, 2009) (stating that the DOC is not a "person" within the meaning of § 1983). Lawson's claim against the DOC is therefore dismissed. The Court need not, and does not, address Defendants' alternative arguments why the claims against DOC should be dismissed.

### C. Official Capacity

For the same reason the claims against DOC must be dismissed, the claims against Warden Green and Lt. Joseph in their official capacities must also be dismissed. A lawsuit against a state official in his or her official capacity "is not a suit against the official but rather is a suit against the official's office." *Will*, 491 U.S. at 71. State officials therefore may not be named in their official capacities as defendants in a § 1983 lawsuit. *See id.*; *Goodmon v. Rockefeller*, 947 F.2d 1186, 1187 (4th Cir. 1991) (per curiam). Accordingly, Defendants' Motion is granted as to the claims against Warden Green and Lt. Joseph in their official

capacities, and the Court need not, and does not, address their alternative arguments for dismissal of the claims against them in their official capacities.

**D.    Lt. Joseph**

The right to be free from cruel and unusual punishment includes the right to be protected from a substantial risk of serious harm at the hands of other inmates. *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *Makdessi v. Fields*, 789 F.3d 126, 132 (4th Cir. 2015). Accordingly, the "Eighth Amendment's prohibition on cruel and unusual punishments imposes certain basic duties on prison officials." *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (quoting *Farmer*, 511 U.S. at 832). Those duties include maintaining "reasonable measures to guarantee the safety of the inmates." *Id.* (quoting *Farmer*, 511 U.S. at 832). However, "not every injury suffered by a prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. Rather, to demonstrate a violation of his Eighth Amendment rights, a plaintiff must satisfy a two-part inquiry that includes both objective and subjective components. *See Raynor*, 817 F.3d at 127.

First, to satisfy the objective inquiry, the plaintiff "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury" or a substantial risk of such harm. *Danser v. Stansberry*, 772 F.3d 340, 346–47 (4th Cir. 2014); *see also Farmer*, 511 U.S. at 834. The objective inquiry requires the Court to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). Here, the evidence showing that Lawson suffered severe injuries, which included stab wounds to his head and body and a collapsed lung, is sufficient to satisfy the objective inquiry. *See, e.g., Odom v. S.C. Dep't of Corrs.*, 349 F.3d 765, 769-70 (4th Cir. 2003) (finding that

evidence of an assault of the plaintiff by other inmates resulting in broken ribs satisfied the objective inquiry at the summary judgment stage).

To satisfy the subjective component of the test, Plaintiff must establish that the prison official involved had "a sufficiently culpable state of mind" amounting to "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834. Evidence establishing a culpable state of mind requires actual knowledge of an excessive risk to the prisoner's safety, in that the prison officials both were aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and that they actually drew that inference. *Id.* at 837. A plaintiff may "prove an official's actual knowledge of a substantial risk in the usual ways, including inference from circumstantial evidence" so that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Raynor*, 817 F.3d at 128 (quoting *Farmer*, 511 U.S. at 842). Actual knowledge of a substantial risk does not alone impose liability. Where prison officials responded reasonably to a risk, they may be found free of liability. *Farmer*, 511 U.S. at 844.

Here, although Lawson has established that he suffered significant physical injuries, he has not demonstrated that Lt. Joseph was deliberately indifferent to an excessive risk to his safety. Lawson advised Lt. Joseph that he did not feel safe in Housing Unit 2 because of his cooperation with prison officials and the presence of Crips gang members, particularly since he had previously been threatened by and separated from a member of that gang. Viewing the evidence in the light most favorable to Lawson, these facts would support an inference that Lt. Joseph was aware of a significant risk to Lawson's safety if he were to remain in Housing Unit 2. The attack, however, occurred after Lawson was moved to Housing Unit 3 as a preventative measure. Although Lawson now claims that he was also at risk there, there is no evidence that

Lawson voiced concerns for his safety in Housing Unit 3 to Lt. Joseph or any other prison official before his transfer there or before the attack occurred. Notably, Lawson's original request was to be "placed in another building" other than Housing Unit 2. Lawson ARP at 1. There also is no evidence that Lawson told anyone about his concern that he would be targeted by those who lost contraband during the search for his television, or where such targeting would occur. Nor had he filed any ARPs or written to the Warden to raise any concerns about Housing Unit 3. As such, Lt. Joseph was not on notice of any substantial risk to Lawson in Housing Unit 3.

To the extent Lawson now claims he would not have been safe anywhere in the prison because "information is not hard to spread i[n] [one] institution," Resp. Mot. Dismiss at 9, ECF No. 17-1, nothing in the record indicates that Lawson informed Lt. Joseph or any other official that he felt unsafe in all parts of ECI until after he was attacked. At that point, according to the letter from Warden Green, Lawson was added to the transfer list to facilitate his transfer to a different facility.

In the absence of evidence of such notice, Lawson relies on *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101 (4th Cir. 1995), in which the court observed that, under some circumstances, "an injury might be so obvious that the factfinder could conclude that the guard *did* know of it because he could not have failed to know if it." *Id.* at 105. In *Brice*, however, the issue was not whether a correctional officer failed to protect the plaintiff from an attack, which occurred without warning, but whether the officer's failure promptly to arrange for medical treatment for the plaintiff's serious jaw injury was due to the officer's "intentionally contrived obliviousness" to the prisoner's medical needs. *Id.* at 102-03, 105-06. Here, the risk of an attack on Lawson in Housing Unit 3 was not so obvious that Lt. Joseph could not have failed to know

about it. Lawson himself asserts that the Crips members were housed on D Tier of Housing Unit 2, not in Housing Unit 3. Although he made clear his concerns regarding his cellmate identifying him as a "snitch," the record shows that Lawson connected those fears to placement in Housing Unit 2, not Housing Unit 3. Tellingly, there is no evidence that Lawson objected to his placement in Housing Unit 3. The attack that Lawson suffered undoubtedly caused him serious harm, but where Lt. Joseph had no reason to believe that Lawson was unsafe in Housing Unit 3, where the attack took place, she is not liable for his injuries. Thus, summary judgment is granted as to the claims against Lt. Joseph.

### E. Warden Green

The doctrine of vicarious liability does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (stating that there is no *respondeat superior* liability under § 1983). Rather, in a § 1983 suit, liability of supervisory officials is "premised on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care. *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Thus, to establish supervisory liability under § 1983, a plaintiff must show (1) that the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to individuals such as the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference or tacit authorization of the alleged offensive practice; and (3) that there was a causal link between the supervisor's inaction and the constitutional injury suffered by the plaintiff. *Baynard*, 268 F.3d at 235.

As to Warden Green, Lawson has failed to plead or demonstrate sufficient facts showing supervisory indifference to, or tacit authorization of, any misconduct by her subordinates. As discussed above, Lawson has failed to show that Lt. Joseph violated his Eighth Amendment rights, so it follows that he has failed to demonstrate that Warden Green authorized or was indifferent to any such violation. To the extent Lawson claims that Warden Green was aware of the risk to his safety because of the ARP he submitted documenting his concerns regarding Housing Unit 2, that claim fails because the ARP made no mention of safety risks associated with assignment to Housing Unit 3, to which he was transferred and where the attack on Lawson took place. Nothing in the record establishes that Warden Green had any reason to know that a threat to Lawson's safety existed in Housing Unit 3, or that she authorized or ignored any other ECI official's violation of Lawson's rights. Accordingly, the Motion will be granted as to the claims against Warden Green.

## CONCLUSION

For the foregoing reasons, the Motion to Appoint Counsel is DENIED and Defendants' Motion to Dismiss or in the Alternative, for Summary Judgment, is GRANTED. A separate Order shall issue.

Date: August 23, 2017

THEODORE D. CHUANG
United States District Judge